Indictment for violation of the insurance laws. The bill of indictment was as follows:
"The jurors for the State, upon their oaths present, that J. J. Arlington, late of Mecklenburg County, on 29 March, 1911, with force and arms at and in the said county, unlawfully and willfully did assume to act as an insurance agent for the `Order of Owls'; the said J. J. Arlington representing the said `Order of Owls' to be a fraternal insurance order or company, having a sick and accident benefit of $6 per week and a death benefit of $100; and the said J. J. Arlington assuming to so act as an insurance agent by soliciting B. S. Davis, B. C. Goldberg, and others to the jurors unknown, to become members of the said `Order of Owls' by keeping open an office and place of business in Charlotte, N.C.; by advertising in the Charlotte Daily Observer and other papers to the jurors unknown; by using printed cards and other methods of advertisment [advertisement]; by receiving from B. S. Davis and other persons to the jurors unknown the sum of $5 each as initiation fee in the said `Order of Owls,' the said `Order of Owls' not being an insurance company lawfully licensed and authorized to do business in North Carolina, and the said J. J. Arlington having no license to act as an insurance agent, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State. And the jurors for the State, upon their oaths, do further present that at and in said county, on the day and year aforesaid, the said J. J. Arlington did engage in the negotiation of unlawful insurance for and with the `Order of Owls,' a foreign fraternal insurance order or insurance company, not admitted nor licensed to do business in the State of North Carolina, by soliciting B. S. Davis, B. C. Goldberg, and other persons to the jurors unknown, to become members of the said `Order of Owls'; by soliciting from the said B. C. Goldberg, B. S Davis, and others to the jurors unknown, the payment of initiation fees, and by the receipt of the said initiation fee from B. S. Davis and other persons to the jurors unknown, contrary to the form of the statute in such case made and provided and against the peace and dignity of the State."
There was verdict of "Guilty." Judgment, and defendant excepted (643) and appealed. *Page 509 
The statute law of North Carolina, more especially chapter 100, Vol. II of the Revisal, makes elaborate and minute provision for the protection of its people from imposition under the guise of insurance, real or pretended, and a department is created, charged with the especial duty of seeing that these rules are complied with.
Under section 4691 and others bearing on the question, all insurance companies must be "licensed and supervised" by the Insurance Commissioner, and, under section 4706, every agent must be licensed. By section 4715 (3) every general agent is required to pay a license tax of $5 per annum, district agent or organizer a like tax of $3, and a local or canvassing agent a tax of $1. These and other special regulations apply to foreign companies doing business in the State, and such companies are also required to make deposit for the protection of their policyholders, etc.
Under sections 4794-4798, inclusive, fraternal orders are defined and regulated, orders which make provision for sick and death benefits by assessment, and by section 4798 these orders are subject to the same rules, regulations, and supervision as foreign insurance companies, except that they are not required to make the deposit or have the paid up capital, as in other companies. Having established these extended regulations, a violation of the same on the part of the companies is made a misdemeanor under the following comprehensive statute, Revisal, ch. XIX, sec. 3484, vol. II:
"If any person shall assume to act as an insurance agent or insurance broker, without license therefor, as required by law, or shall act in any manner in the negotiation or transaction of unlawful insurance with a foreign insurance company not admitted to do business in this State, or as principal or agent shall violate any provision of the law in regard to the negotiation or effecting of contracts of insurance, he shall be guilty of a misdemeanor, and upon conviction shall be punished (644) by a fine of not less than $100 nor more than $500 for each offense." Indicted under this section in form as above stated, it was made to appear on the trial that the Order of Owls is an association which seems to have had its origin in South Bend, Ind., consisting of the home nest, with power of self-perpetuation and operating under a plan by which branch nests may be and have been organized in large numbers in various sections of the country, under a form of by-laws suggested by the home nest. These by-laws contain provision for sick and death benefits, but the rules or constitution established for the home *Page 510 
nest do not profess to control the branch nests in this feature of benefits except in section 30, which is to the effect that each subordinate nest may pay death benefits to the executor, mother, wife, or child of a member who dies in good standing, to an amount not exceeding $100. As showing the general nature of this organization and the control and supervision vested in the home nest towards the subordinate nests, the following provisions appear in the constitution:
"1. This organization shall be named `Order of Owls.' It object, the advancement of its members, socially, morally, intellectually, and otherwise.
"2. This society shall consist of an organizer's branch and subordinate branches. The organizer's branch shall be known as `Home Nest,' and the subordinate branches shall be respectively known as `Nest No. _____'.
"3. The home nest shall consist of the organizer's thereof or their successors elected by unanimous vote of the survivors to fill any vacancy caused by the death or resignation or removal of any member. No member of the home nest shall be expelled except on the unanimous vote of all other members thereof.
"4. Branch nests shall consist of not less than ten persons, and no male shall be a member of a branch having female members, or vice versa.
. . . . . . . . . . . .
"8. Each nest shall pay the `Home Nest,' for the support of the general organization, the sum of 10 cents per member quarterly at the end of each quarter for each member of the branch who was in good (645) standing at any time during such quarter.
. . . . . . . . . . . .
"14. The supreme president may at any time revoke the charter of any nest or suspend for any length of time the existence of such nest; and in case of his doing so, all the property and funds of the nest shall become the property of the home nest and be paid to it.
. . . . . . . . . . . .
"17. The sum of $2 shall be remitted the home nest for each candidate initiated and $1 additional for each charter member.
"18. The sole executive power of this organization shall be vested in the home nest, and in the supreme president when the home nest is not in session, including the right to grant dispensations of any and all kinds.
. . . . . . . . . . . . .
"28. The supreme president shall designate the first place of holding all conventions. The home nest shall be at South Bend, Ind., unless its members see fit to change it. Except as herein otherwise provided, *Page 511 
the executive, legislative, and all other powers of the home nest shall be vested in a trinity, consisting of the supreme president, secretary, and treasurer."
There was further testimony to the effect that the defendant, not having any license from the Insurance Commissioner, "advertised and represented (a) that the Order of Owls was there; (b) that he was their representative; (c) that the Order of Owls paid accident and death benefits; (d) he solicited people to come at once and join; (e) he gave a membership receipt to those who applied and paid the required $5."
In view of this evidence, we concur in the ruling of the trial judge, that if the relevant facts were accepted by the jury, the defendant was guilty as charged in the bill of indictment.
"He unlawfully assumed to act as insurance agent for the `Order of Owls,' represented by him to be a fraternal insurance order. He unlawfully engaged in negotiating for insurance in the `Order of Owls,' a foreign fraternal insurance order, not admitted or licensed to do business in this State."
It is urged that the first count of the bill is fatally defective (646) and no conviction can be had thereon, for that it contains no direct averment that the "Order of Owls" is a company subject to the insurance regulations; but in our opinion no such averment is required for a proper indictment, and no such fact is essential to constitute the crime.
The entire, certainly the chief, purpose of this legislation is to protect people from harmful imposition in contracts and dealings of this character, and the evil which the statute is designed to prevent is as threatening in the case of a bogus as a real company, perhaps more so.
The language of the act relevant to the charge contained in the first count, "If any person shall assume to act as an insurance agent without a license therefore as required by law." The facts in evidence show that the defendant, in his published advertisement and his cards circulated in the vicinity, in taking money and issuing receipts, assumed to be the agent of a company paying sick and death benefits. His conduct comes within the permissible and proper meaning of the words used in the statute and clearly within the mischief contemplated, and the first count in the bill of indictment must be held sufficient. S. v. Leeper, 146 N.C. 655; S. v.Harrison, 145 N.C. 417.
It was further contended that no conviction should be allowed on either count because it did not appear that any local nest was organized in the locality as stated, and, if otherwise, that the insurance feature was optional with the local nest. But on the facts in evidence neither position can be maintained. It appears that under the constitution these local nests, having the insurance features of death and sick benefits, *Page 512 
have been organized in all portions of the country, doing business under by-laws furnished by the home nest, and in its scheme of government the authority of the home nest is so absolute and all-pervading that it must be judged and have its complexion and status fixed by what it sanctions and approves, and this condition may not be properly altered or affected because some particular nest does or does not adopt this insurance feature. According to defendant's cards, by which persons were induced to apply for membership and pay their money, these are the relevant facts:
(647) Reasons Why You Should Join the Order of Owls:
1. Order of Owls has sick and accident benefit of $6 per week.
2. Order of Owls has $100 death benefit.
3. Order of Owls furnishes free physician for you and your family.
4. Order of Owls will help you to get a position when you are out of employment.
5. Order of Owls will help you in your business. They trade with each other.
6. Order of Owls furnishes you social advantages.
7. The dues are 50 cents per month; no extra assessment.
8. After closing the charter, the initiation fee in this city will be $25.
9. You will get in on the election of officers, if you join now and are one of the leaders.
10. You do not have to take the initiation if you join now, and the total cost is only $5.
Be a Leader! Join Now!
 Hoo! Hoo!
 The Order of Owls is Here!
The Order of Owls is more than six years old and has about 1,400 nests with a membership of nearly 200,000 in the United States, Canada, Alaska, Cuba, Mexico, Porto Rico, Philippines, Sandwich Islands, New Zealand, Australia, and South Africa. The Order of Owls is made up of the
Jolliest and Best Fellows on Earth.
The company, therefore, which defendant assumed to represent was a fraternal order, coming within sections 4795-4798 of Revisal, and, in soliciting contracts and receiving money for it, when neither he nor his company had been properly licensed, defendant was guilty under the second count in the bill. The authorities relied upon by defendants, as far as examined, do not affect our conclusion. In some of them the bill was questioned because no avert act was charged, as in Fiske v. State. *Page 513 87 Miss. 251. In others, as in S. v. Campbell, 46 N.C. 944, the statute, by correct interpretation, was held to apply only to incorporated companies. In the case at bar the avert acts are fully set forth and the law is not so restricted. Throughout the statute, in sections relevant to the inquiry, the words used are insurance companies, associations, (648) and orders, and clearly contemplate both incorporated and unincorporated companies. This business of insurance and insurance companies has become of such great interest and importance that our statutes, as stated, have made extended regulations for its supervision and control. The department established for the especial purpose, under the direction of its active and capable commissioner, has done much valuable work in the protection of the people of the State, and in cases permitting constructions that interpretation should be adopted which is best promotive of the public policy and beneficent purpose of the law. There is
No error.